IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



ROBERT TANSEY,                §
                              §
        Plaintiff,            §
                              §
VS.                           §   NO. 4:12-CV-387-A
                              §
CITY OF KELLER, TEXAS,        §
                              §
        Defendant.            §

MEMORANDUM OPINION
and
ORDER

Came on for consideration the motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, filed in the above-captioned action by defendant, City of Keller, Texas ("City"). Plaintiff, Robert Tansey, filed what appears to be his response, titled "Motion to Deny Dismissal of Case," and City filed a reply. Having now considered all of the parties' filings, plaintiff's amended complaint ("Complaint"), and applicable legal authorities, the court concludes that the motion to dismiss should be granted.

I.

Background and Allegations of the Complaint

Plaintiff initiated this action by the filing on December 1, 2011, of his original complaint in the Northern District of Texas, Dallas Division. Plaintiff twice amended his pleadings,

with the most recent revision, the Complaint, filed February 23, 2012. The case was transferred to the Fort Worth Division, to the docket of the undersigned, following the filing by City of a motion to transfer venue.

The Complaint makes the following factual allegations:

In the fall of 2007, plaintiff and a friend were at plaintiff's home in City listening to music and drinking beer, with plaintiff's patio doors open. A song came on called "China White," which describes a "pure grade of heroin." Pl.'s Compl. at 2. "Shortly after" this occasion, two of City's plainclothes detectives told a reference librarian at City's library that plaintiff "was 'the biggest drug dealer in NE Tarrant County, what's he does [sic] here so much?'." Id. at 3.

On an unspecified occasion one of plaintiff's neighbors called him a "drug seller" from across the yard, and in the spring of 2010 another accused him of being responsible for the death of a teenage resident of City who died of a heroin overdose. In May 2010 one of plaintiff's coworkers told him that the coworker's son-in-law was with City's police force, and "[t]hey know what's in your house, and want to get to it." Id.

At an unknown time plaintiff placed an ad for a roommate using City's library computer. An individual named Ronald Lowe ("Lowe") answered the ad. Lowe claimed to be a "a detective

2

working on a $110 million deal, of which he was to get 10%." Id. at 4. The Complaint alleged various mysterious events that occurred which plaintiff believed were connected to Lowe, such as Lowe giving a fictitious employment address, appearing at plaintiff's house before knowing the address, plaintiff coming home to find his "Zero Halliburton aluminum attache case on his bed, with its 22 [inch] tightly fitted hinge pin protruding," id., and signs of apparent entry into plaintiff's attic. Lowe also suggested that plaintiff could use his printer and computer to counterfeit money if he was short on cash.

At some point plaintiff realized he had a virus on his computer; plaintiff unknowingly spread the virus to the computer systems of two employers, causing him to lose his jobs. Although he searched on City library computers for ways to remove the virus, he was unable to find any such information, although such can be found on other computers. City's information technology personnel denied installing filtering software on the library's computers. Later, plaintiff took his laptop computer to City's library where he intended to use a software program he purchased to remove viruses. While at the library he overheard someone say "don't let the laptop boot here; it will infect the library systems." Id. at 6. Plaintiff was then unable to start his computer, although he was subsequently able to start it at home.

Soon thereafter plaintiff overheard his neighbors talking about someone not having internet access or security.

In summer of 2009 plaintiff returned home and found his "concrete pond drained, killing his prized Koi." Id. at 7. The pond was drained "to find the alleged cache of China White heroin." Id. On two unspecified occasions the alarms in plaintiff's cars went off at 2:00 a.m. Plaintiff found the garage door open, and a trail seemed to indicate that a person was heading in the direction of a neighbor's house.

On an unspecified occasion plaintiff's ex-wife reported seeing someone moving from plaintiff's deck to the back yard. That evening, upon returning home, plaintiff found a bag of what appeared to be marijuana in his home. On another occasion plaintiff purchased a software package containing a "3.5 [inch] floppy disk." Id. at 8. Upon returning from work the next day, plaintiff found the box was missing the floppy disk.

On another unspecified occasion plaintiff's ex-wife told plaintiff that the ex-wife's niece wanted to see him. When plaintiff arrived at the niece's apartment, his ex-wife told him that her new laptop, which she received from her employer, had to be plugged in to a wall outlet to access the internet, and that her internet service provider told her all laptops operated that

4

way. Plaintiff called the internet provider; its employees denied making such a statement.

Plaintiff often saw City police cars at City's library when he was there; the police cars left when plaintiff did. When plaintiff was there after dark the police cars "would turn on high beams to illuminate and temporarily blind [plaintiff] as he walked across" the parking lot. Id. at 9.

Plaintiff began working at another company in Irving, Texas. An employee of the company told plaintiff that the employee's friend could remotely access the company's computer network. Minutes later, plaintiff saw one of his neighbors on the employer's premises, and plaintiff was immediately terminated.

In June 2008 plaintiff purchased a converter box to allow his analog television to receive digital signals. Shortly thereafter, plaintiff noticed interference with the signal. Plaintiff "detect[ed] the interference by shielding the antennae from the westerly source of the interference." Id. at 10. Plaintiff then went into his back yard and noticed a "strange metal booth ha[d] been hastily constructed on the rear" of a neighbor's garage, with a window-type opening that faced the rear of plaintiff's house. Id. Plaintiff noticed he could not "use his cell phone while in his back yard, and TV interference [was] becoming stronger, making all stations unwatchable." Id.

5

Plaintiff called and sent facsimiles to the Federal Communications Commission to have them "investigate the nuisance transmissions emanating" from the structure attached to the neighbor's garage. Id. at 11. Plaintiff also contacted a local television station, which sent a team to plaintiff's home. "The transmissions stopped when engineers arrived." Id.

Plaintiff contacted City Hall regarding the "energy nuisance transmissions." Id. The City employee he spoke to told him to contact City's police department, which plaintiff did. The police department employee told him there was no law against the "nuisance RF energy transmitting device" in his neighbor's garage. Id. Plaintiff then sent emails to City's mayor, "demanding a stop to the RF energy transmissions." Id. at 12. Plaintiff realized that all the birds and squirrels had disappeared from his yard, and that his dogs would also no longer venture into the back yard. Plaintiff began to notice physical symptoms when he neared the boundary of his yard and the neighbor's metal booth attached to the garage, include feeling disoriented, having bloody diarrhea, and "severe painful eye problems." Id. at 13.

Plaintiff pleaded with City's mayor to stop the transmissions. Plaintiff later received an email from a City police officer, telling plaintiff that the mayor had instructed

the officer to meet with plaintiff about the "harmful RF energy" transmissions and that City "would do anything it could, that it had control over." Id.

Plaintiff then received an email from the officer that "state[d] he ha[d] issued a warrant for [plaintiff's] arrest, as [plaintiff] had texted [plaintiff's] wife to find out information about the home we shared for a decade." Id. Plaintiff met with the officer and requested the police department's assistance "in stopping the electronic harassment." Id. Plaintiff suggested the officer obtain electric bills for the neighbor "using the transmitter." Id. at 14. Plaintiff received an email from the officer saying plaintiff needed "a Mental Health Exam," which plaintiff agreed to if the officer would submit to a polygraph test. Id. Plaintiff attempted to obtain copies of the email exchanges between him and the officer, but the emails had been deleted.

Plaintiff alleged a cause of action against City for illegal search and seizure that stated, in pertinent part:

> 4.3 Criminal actions were commenced against Plaintiff Name by the Keller Police Department working on behalf of and at the direction of Keller City Mayor and Administration personnel.
>
> 4.4 Plaintiff's [] persecution was initiated or procured by City of Keller personnel.
>   a. [Plaintiff] was innocent;

7

      b.   [City] acted without probable cause;
      c.   [City] acted with malice in slandering and harassing [plaintiff], planting an agent, [Lowe], to engage in unlawful search activities to bypass Constitution [sic] rights against illegal and unreasonable searches.
      d.   [City] damaged [plaintiff's] name.

Id. at 14-15. Plaintiff also alleged a cause of action pursuant to 42 U.S.C. § 1983 for violations of his rights under the Fifth and Fourteenth Amendments.

## II.

### Standards Applicable to Motion to Dismiss

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides, in a general way, the applicable standard of pleading. It requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks and ellipsis omitted). Although a complaint need not contain detailed factual allegations, the "showing" contemplated by Rule 8 requires the plaintiff to do more than simply allege legal conclusions or recite the elements of a cause of action. Id. at 555 & n.3. Thus, while a court must accept all of the factual allegations in the complaint as true, it need

not credit bare legal conclusions that are unsupported by any factual underpinnings. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.")

Moreover, to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the facts pleaded must allow the court to infer that the plaintiff's right to relief is plausible. Id. at 678. To allege a plausible right to relief, the facts pleaded must suggest liability; allegations that are merely consistent with unlawful conduct are insufficient. Twombly, 550 U.S. at 566-69. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

III.

Analysis

In the motion to dismiss, City first contends that plaintiff's claims are barred by limitations, because the facts alleged against City occurred more than two years prior to the date plaintiff filed his initial complaint. Second, City argues that plaintiff failed to plead sufficient facts to allege municipal liability. The court does not find it clear from the face of the Complaint that limitations bars all of plaintiff's

claims. Nevertheless, dismissal of all of plaintiff's claims is warranted because he has failed to allege sufficient facts to support liability against City, or to state any claim for relief.

It is well-settled that local government entities such as City cannot be held liable for the acts of their employees solely on a theory of respondeat superior. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978). Liability may be imposed against a local government entity under § 1983 only "if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." Connick v. Thompson, __ U.S. __, 131 S. Ct. 1350, 1359 (2011) (quoting Monell, 436 U.S. at 692) (internal quotation marks omitted).

To hold City liable under § 1983 requires plaintiff to "initially allege that an official policy or custom was a cause in fact of the deprivation of rights inflicted." Spiller v. City of Texas City, Police Dept., 130 F.3d 162, 167 (5th Cir. 1997) (internal quotation marks and citation omitted). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 131 S. Ct. at 1359. Liability against local government defendants pursuant to § 1983 thus requires proof of a

policymaker, an official policy, and a violation of constitutional rights whose "moving force" is the policy or custom. Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001).

Here, the Complaint falls far short of the aforementioned standard for alleging municipal liability. Nowhere in the fifteen pages of factual allegations does plaintiff identify a policymaker or unlawful policy. Many of the factual allegations concern acts by plaintiff's neighbors or others in the community, none of which can be attributed to City.

More fundamentally, none of the facts found in the Complaint can be construed to allege the violation of a constitutional right. Although plaintiff alleged that City's employees said and did various things, none of those things amounts to a constitutional violation. Further, while plaintiff alleged that City commenced criminal actions against him, "persecut[ed]" him, Pl.'s Am. Compl. at 14, and harassed him, the Complaint contains no factual allegations to support such conclusory assertions. Likewise, plaintiff contended that City planted Lowe "to engage in unlawful search activities," id. at 15; however, there are no facts to support such a claim--only plaintiff's speculation. In sum, the Complaint lacks allegations, let alone proof, "of a policymaker, an official policy, [or] a violation of

11

constitutional rights whose 'moving force' is the policy or custom." Piotrowski, 237 F.3d at 578.

Plaintiff's claim of illegal search and seizure fares no better. No facts are alleged in the Complaint as would support such a claim. The court does not accept conclusory allegations or unwarranted deductions of fact as true, and that is all plaintiff has provided. Twombly, 550 U.S. at 555 (2007). Plaintiff has failed to allege anything in the Complaint to show a plausible right to relief against City.

Following the filing of the complaint by which he initiated this action, plaintiff twice amended his pleadings. The Complaint which is the subject of the instant motion to dismiss followed City's first motion to dismiss, raising grounds identical to those in the instant motion. Thus, plaintiff has had three opportunities to plead his best case, and he was put on notice of potential defects in his pleadings by City's first motion to dismiss. The court is satisfied that nothing could be gained by affording plaintiff yet another bite at the apple.

IV.

Order.

Therefore,

The court ORDERS that City's motion to dismiss be, and is hereby, granted.

The court further ORDERS that all claims and causes of action brought by plaintiff, Robert Tansey, against defendant, City, be, and are hereby, dismissed with prejudice.

SIGNED June 15, 2012.

JOHN McBRYDE
United States District Judge